AGREEMENT

BETWEEN

**AIRGAS WEST, INC.**

AND

HAWAII TEAMSTERS AND ALLIED WORKERS

Local 996

<u>**January 1, 2010 – April 30, 2011**</u>

EXHIBIT " 1 "

**AIRGAS WEST, INC.**

and

HAWAII TEAMSTERS AND ALLIED WORKERS - LOCAL 996

INDEX

| SUBJECT | PAGE(S) | SECTION |
|---|---|---|
| Assistant Business Agents | 13-14 | 12 |
| Bargaining Unit Work | 31 | 33 |
| Bulletin Board | 15 | 16 |
| Call-Back | 12 | 10 |
| Coffee Break | 22 | 21 |
| Deduction of Union Dues from Wages | 6 | 3 |
| Dental Plan | 26-27 | 25 |
| Disability Insurance | 27 | 27 |
| Discipline or Discharge | 14-15 | 15 |
| Discrimination | 7 | 5 |
| Document Contains Entire Agreement | 33 | 40 |
| Drug Testing | 30 | 32 |
| Duration | 34 | 45 |
| Flexible Spending Accounts | 27 | 26 |
| Grievance Procedure | 15-18 | 17 |
| Group Life Insurance | 28 | 28 |
| Holidays | 20-22 | 19 |
| Hospital-Surgical-Medical-Dental Plan | 26-27 | 25 |
| Hours and Overtime | 9-12 | 8 |
| Jury Duty | 26 | 24 |
| Leave Policy | 25-26 | 23 |
| Management Rights | 33-34 | 41 |

**AIRGAS WEST, INC.**

and

HAWAII TEAMSTERS AND ALLIED WORKERS - LOCAL 996

<u>INDEX</u>   (continued)

| SUBJECT | PAGE(S) | SECTION | |
|---|---|---|---|
| Masculine Means Feminine .................... | 33 | 37 | |
| Medical Examinations .................... | 30-31 | 32 | |
| Military Service ........................ | 34 | 42 | |
| Minimum Time ........................... | 12 | 9 | |
| **Miscellaneous**........................... | | **34** | **44** |
| Modification of Agreement ............... | 33 | 38 | |
| No Strikes or Lockouts ................... | 14 | 13 | |
| Parking ................................. | 32 | 36 | |
| Picket Line ............................. | 14 | 14 | |
| Reimbursement for HazMat Endorsement...... | 34 | 43 | |
| Right of Access to Employer's Premises ... | 7 | 6 | |
| Seniority ............................... | 7-9 | 7 | |
| Separability ............................ | 33 | 39 | |
| Separation Allowance .................... | 29-30 | 31 | |
| Sickness and Industrial Accident and Benefit Plan ........................... | 18-20 | 18 | |
| Subcontracting .......................... | 31 | 34 | |
| Successors and Assigns .................. | 6 | 4 | |
| Temporary Transfer ...................... | 13 | 11 | |
| Travel .................................. | 31-32 | 35 | |
| Uniforms and Safety Boots ............... | 22 | 20 | |
| Union Recognition and Coverage .......... | 5 | 1 | |

No. 1695   P. 4                                    Dec. 16. 2009  7:54AM

AIRGAS WEST, INC.

and

HAWAII TEAMSTERS AND ALLIED WORKERS ~ LOCAL 996

INDEX   (continued)

| SUBJECT | PAGE(S) | SECTION |
|---|---|---|
| Union Security ........................... | 5-6 | 2 |
| **Union Supplemental 401k Plan**............. | 28 | 29 |
| Vacations ................................ | 22-24 | 22 |
| Wages .................................... | 28-29 | 30 |

Exhibit "A" -   Hourly Wage And Classification

Exhibit "B" -   Assignment of Wages to Cover
Dues, Initiation Fee and
Assessments

Exhibit "C" -   Assignment of Wages for Union's Negotiation and
Administration of Contract

Exhibit "D" -   Notification of Hiring, Layoff, Termination and
Promotion

Exhibit "E" -   Alcohol and Drug Abuse

Exhibit "F" -   Safety Bonus Program

Exhibit "H" -   Letter of Agreement - DRIVE Deductions

Exhibit "I" -   Letter of Agreement - Retiree Medical

## AGREEMENT

THIS AGREEMENT, made and entered into by and between **AIRGAS WEST, INC.,** hereinafter referred to as the "Employer", and the HAWAII TEAMSTERS AND ALLIED WORKERS, LOCAL 996, hereinafter referred to as the "UNION",:

## WITNESSETH:

### Section 1.   UNION RECOGNITION AND COVERAGE

1.1  Pursuant to certification by the National Labor Relations Board, the Union is hereby recognized as the sole and exclusive collective bargaining agent for all production, maintenance and transportation employees at the Employer's main plant, warehouse, garage and repair shop in Kalihi, Honolulu; its plant at Barber's Point, Oahu; and the Island of Hawaii.  Excluded are office clerical employees, confidential employees, professional employees, guards and/or watchmen, and supervisors as defined in the National Labor Relations Act, as amended, and all salesmen.

### Section 2.   UNION SECURITY

2.1  Each present regular employee covered by this Agreement who was a member of the Union on the execution date thereof shall maintain such membership by continuing to tender dues and assessments to the Union for the duration of this Agreement.

2.2  Present employees who are not now members of the Union shall, immediately following the expiration of thirty (30) days after the execution of this Agreement, choose, as a condition of continued employment, one of the following options:

a.  Become and remain a member of the Union for the duration of this agreement; or

b.  Pay to the Union for the duration of this Agreement (either directly or by means of an Exhibit "C" Assignment of Wages for Union's Negotiation and Administration of contract) a monthly amount equal to the membership dues uniformly required for employees in their same category, as a condition of acquiring and retaining membership in the Union.

2.3  Any new employees hired after the execution date thereof shall, immediately following expiration of thirty (30) days after date of hire, become and remain a member of the Union to the extent of paying membership fees, assessments, and dues uniformly required as a condition of employment, with the exception of student summer hires who shall be required to

become members of the Union to the aforementioned extent only after ninety (90) consecutive calendar days of employment. Such summer hires shall not be eligible for overtime work, nor will they deprive any regular employees of their normal work opportunity.

2.4 For purposes of training sales personnel, they shall be allowed to work in the warehouse and production areas until completion of training.  Such assignments should not normally exceed 10 days per salesman in a single department but may be extended if extensive technical training is required, not to exceed a total of 25 days per department.

## Section 3.  DEDUCTION OF UNION DUES FROM WAGES

3.1  The Employer agrees to deduct uniformly applied Union dues, initiation fee and assessments from the wages of employees who voluntarily request in writing their deduction. An employee who wishes to have his Union dues, initiation fee and assessments deducted shall sign a form identical with the attached form marked Exhibit "B".  When filed with the Employer, the form will be honored in accordance with its terms.

3.2  Deductions for Union dues will not be made more often than once a month.  If an employee does not have the amount of a monthly deduction due him on any payroll from which deductions are made for other employees, the deduction shall be made from the next succeeding payroll on which he has the amount of the deduction due.

3.3  Deductions required by law, garnishments, and deductions for payment of indebtedness to the Employer shall have priority over deductions for Union dues.

3.4  Deductions will be promptly transmitted to the Union by check payable to its order.  Upon issuance and transmission of a check to the Union, the Employer's responsibility shall cease with respect to deductions covered thereby.  The Union hereby undertakes to indemnify and hold the Employer harmless from all claims against it for or on account of any deduction made from the wages of any employee.

## Section 4.  SUCCESSORS AND ASSIGNS

4.1  In the event the entire operation is sold, leased, transferred or taken over by sale, transfer of interest, lease, assignment, the Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the operation covered by this agreement or any part thereof.  Such notice shall be in writing with a copy sent to the Union within a reasonable amount of time.

## Section 5.   DISCRIMINATION

5.1  In accordance with the policy of the Employer and the Union, it is agreed that there will be no discrimination against any Vietnam Era veteran or any employee because of race, sex, religion, qualified individual with a disability, age, national origin, color, ancestry and any other characteristic protected by Federal, State or Local law in the administration or application of the terms of this Agreement. The Employer shall be permitted to take all actions necessary to comply with the American Disabilities Act accommodation requirements.  Any contractual provision that conflicts with such accommodation actions shall be superseded.  Any grievance arising under this paragraph shall be subject to the grievance procedure as set forth in this Agreement.

5.2  The Employer shall not discriminate against any employee because of his membership in the Union or for legitimate Union activity; provided, however, that such activity shall not be conducted during working hours or interfere with the conduct of the Employer's operations.

## Section 6.   RIGHT OF ACCESS TO EMPLOYER'S PREMISES

6.1  Authorized representatives of the Union shall have access to the Employer's establishment for the purpose of investigation and handling of grievances; provided that the representative first obtain advance permission of the Company management to make such visit and there be no interference with the work of the employees during such visit.  Such permission will not be unreasonably withheld.  In this connection, the Union agrees to furnish the Company with the names of its authorized representatives for the purpose of this Article and only those persons shall be given access to the Employer's premises.  This Article does not survive the expiration of this Agreement.

## Section 7.   SENIORITY

7.1  Seniority shall mean the employee's length of continuous service with the Employer, except in the making of temporary layoffs where departmental seniority shall apply.

7.2  Seniority shall not apply to an employee until he shall have completed three (3) months of continuous service with the Employer.  Upon satisfactory completion of said probationary period, the employee will be credited with seniority from his date of hire.

7.3  Seniority shall be considered broken by (a) discharge, (b) resignation (c) retirement, (d) twelve (12) consecutive months of layoff, (e) thirty-six (36) months of absence by reason of illness, (f) work elsewhere for pay while on leave

of absence, without the Employer's permission, (g) failure to return from a leave of absence, within the time limits which the leave was granted, and (h) when an employee has had a period of absence of more than two (2) consecutive days without notifying the Company except because of hospitalization or other reasons beyond a reasonable persons control.  In such cases of absence due to illness, seniority shall be frozen after twenty-four (24) months of absence.

7.4  Layoffs and Recalls.  In making layoffs which are expected to last for more than four (4) weeks, and in making recalls after such layoffs, the employee with the least amount of seniority in any classification will be the first laid off from that job but he may replace an employee in the same or lower labor grade with the lesser seniority in any classification providing he has the qualifications to satisfactorily perform the job and has greater seniority. Employees who are displaced from their jobs as a result of such bump back procedure may themselves move back and replace employees having the least seniority in any classification in the same or lower labor grade providing such employee has the necessary qualifications and seniority.  In the administration of this paragraph, a separate seniority list shall be maintained for employees on the Island of Hawaii and there shall be no bumping between the Islands of Oahu and Hawaii.

7.5 In making layoffs which are expected to last for less than four (4) weeks and in making recalls after such layoffs, an employee's length of continuous service with the Employer within his department shall govern, provided, however, the employee is competent in the job and can satisfactorily perform the work required.

7.6  In the administration of the above paragraph relative to temporary layoffs, departments shall be as follows:

                    a) Warehouse Department
                    b) Trucking Department
                    c) Liquid and Gases Department
                    d) Production Maintenance Department
                    e) Island of Hawaii

7.7  In recalling eligible laid-off employees, the Employer will give notice at the employee's last known address by oral advice directly to him, or by written notice left there at, of opportunity for re-employment. A negative reply, failure to respond within twenty-four (24) hours after receipt of said notice, or failure to report for work at the time designated shall be considered a resignation. It shall be the responsibility of the employee to notify the Employer of any change of address. An employee who fails to notify the Employer of change of address may not claim to be aggrieved under any of the provisions of this Agreement.

8

7.8 Nothing herein shall be considered to preclude the making of temporary transfers and/or hires to fill vacancies when deemed necessary by the employer or when circumstances do not permit the lapse of time or the giving of notice as herein provided.

7.9 In the event of layoff, which at the time appears to be permanent, the employee or employees involved will be given two (2) weeks' advance notice of the impending action, or pay therefore, provided the employee has completed the probationary period of three (3) months.

7.10 Posting and Promotions. In order to afford employees an opportunity to apply for promotion to permanent full-time job vacancies in higher rated jobs covered by this Agreement, notice of such vacancies shall be posted on the Employer's bulletin board for a period of three (3) working days before the vacancy is filled on a permanent basis. This shall not be construed to preclude temporary transfers and/or hires to fill such vacancies when deemed necessary by the Employer. All employees of the Employer will be considered in filling such vacancies, but any employee who fails to apply for the vacancy may not claim to be aggrieved when the vacancy is filled.

7.11 Promotions to fill permanent full-time job vacancies shall be made on the basis of seniority and qualifications. In the event two (2) or more employees have essentially the same qualifications, the employee with the greatest length of continuous service with the Employer shall be selected. Prior job performance will be considered as an element of qualifications in the application of this selection procedure.

7.12 Notification to the Union. When new or additional employees are needed, the Employer shall notify the Union Business Office of the number and classification of employees needed. The Union shall have twenty-four (24) hours from receipt of such notice to nominate members for such jobs. The Employer shall choose between any nominees of the Union and any other applicants on the basis of the respective qualifications for the job. The Employer will notify the union of all hirings, layoffs, terminations and promotions on Exhibit "D" attached hereto.

## Section 8.   HOURS AND OVERTIME

8.1 In the administration of this section, departments or jobs are defined as being continuous or non-continuous operations. Continuous operations are defined as those operations requiring work to be performed on either a twenty-four (24) hour a day basis or a seven (7) day week basis.

## General Application

The following provisions shall apply to both continuous and non-continuous operations:

8.2   **Workday.**   The workday is defined as a 24-hour period beginning with the first scheduled hour worked by an employee.

8.3 **Overtime.**   Work performed by an employee which is herein defined as overtime shall be compensated for at one and one-half (1 1/2) times the straight time rate.   Worked performed by an employee in excess of eight (8) straight time hours, exclusive of meal period, in any one (1) day and work performed in excess of forty (40) hours in any one (1) workweek shall constitute overtime.   Overtime shall be calculated to the nearest fifteen (15) minutes.   No overtime shall be paid unless the work is performed at the request of or on the order of the Employer.

8.4   Work performed by an employee on the sixth consecutive day of the workweek shall be paid for at the overtime rate, providing the employee has not taken time off on an unexcused absence.   Work performed by an employee on the seventh consecutive day of the workweek shall be paid for at two (2) times the employee's straight time rate.   Work performed by an employee in excess of twelve (12) hours (exclusive of meal periods) in a workday shall be paid for at two (2) times the employee's straight time rate.   Upon completion of twelve (12) hours of work, a one-half (1/2) hour paid meal break shall be furnished.

8.5   **Shift Premiums.**   A premium of forty cents ($.40) an hour shall be paid for all hours worked on the second shift, which is defined as any shift starting after completion of the earliest starting first shift.   A premium of forty-five cents ($.45) per hour shall be paid for all hours worked on the third shift, which is defined as any shift starting after completion of the second shift.   Shift premiums shall be included in the computation of overtime.

8.6   **No Pyramiding.**   When two (2) or more premium rates are applicable to the same hour or hours worked, there shall be no pyramiding or adding together of such rates and only the higher of the applicable rate shall apply.

8.7   **Work Schedules.**   Work schedules for each department and/or employee shall be conspicuously posted.   The start time, workday, workweek and work shift will be posted before the start of the workweek, provided, however, that changes may be made where it is necessitated by reason of an unforeseen situation which requires immediate action. Where customer demands, conditions and/or Employer's equipment changes during

the term of this Agreement, the Employer and the Union will negotiate adjustment of employee established start times.

8.8   Ten (10) Hour Rest Period.   Except in cases of a shift change, employees shall be entitled to not less than ten (10) hours' rest between the termination of work in any one (1) day and commencement of a scheduled workday thereafter.   Any work performed without the aforementioned ten (10) hour rest period shall be paid for at one and one-half (1 1/2) times the straight time rate until such ten (10) hour period has elapsed.   In the event an employee works beyond his normally scheduled work shift or in the event he is called back to work due to emergencies, the Employer shall be permitted to schedule such employee for a ten (10) hour period of rest without penalty.

8.9 Nothing contained in the Agreement shall be construed as a guarantee of work or workweek now or in the future.

CONTINUOUS OPERATIONS

The following provisions shall apply to continuous operations.

8.10 Workweek.   The normal workweek shall be 11:30 p.m. Sunday to 11:29 p.m. the following Sunday.

8.11 Start Time.   The first (day) shift shall commence between the hours of 6:00 a.m. and 10:30 a.m.

8.12 The Employer will make every effort to keep the work schedule for all employees to not more than five (5) consecutive workdays.   In the event the Employer finds it is impossible to effect such a work schedule, (except for monthly shift change), the Employer agrees to pay one and one-half (1 1/2) the employee's straight time pay rate for the sixth (6th) consecutive day of work and two (2) times the employee's straight time rate of pay for the seventh (7th) consecutive day of work irrespective of work or calendar week.

8.13 All shifts will be assigned on a rotating basis once a month.

NON-CONTINUOUS OPERATION

The following provisions shall apply to non-continuous operations:

8.14 Workweek.   The normal workweek is defined as Monday through Friday for all departments except Kalihi and Island of Hawaii "Will Call" Departments.   For "Will Call" operations the normal workweek will consist of five (5) days between Monday and Saturday.

8.15 Start Time.   The normal workday shall commence between the hours of 6:00 a.m. and 10:30 a.m. The custodian shall be excluded from the workweek and start time provisions of this Agreement.

8.16 Meal Period.   A meal period of at least one-half (1/2) hour's duration shall be afforded to each employee covered by Agreement, such meal period to be taken between the third and fifth hours of the shift as specific times as designated from time-to-time by the Employer.   If an employee is required by the Employer to work more than five (5) consecutive hours after the start of his shift without being given an opportunity to eat.

> (a) When working at straight time rate, he shall be paid at one and one-half (1 1/2) times the straight time rate,

> (b) When working at the overtime rate, he shall be paid at two (2) times the straight time rate,

for all time worked in excess of the first five (5) hours until such time as the employee is given the opportunity to eat.

8.17 Four (4) Ten (10) Hour Shift.   It is the Company discretion to consider 4/10 schedules. The Company and the Union will negotiate and agree to the terms and conditions of the 4/10 schedule prior to implementation.

## Section 9.   MINIMUM TIME

9.1 Employees on an hourly wage base will be given a minimum of four (4) hours' work or four (4) hours' pay at the applicable rate when asked to report for work unless they quit or voluntarily stop work,.

## Section 10.   CALL-BACK

10.1 Call-Backs.   If an employee, other than a home care driver, is called back or otherwise required to return to work after completing his work for the day and clocking out, he shall be paid at the overtime rate for all hours worked and shall have a minimum pay guarantee for such call-back of four hours at one and one-half (1 1/2) times the straight-time hourly rate of pay.

10.2   If a home care driver is called back or otherwise required to return to work for the purpose of making an emergency home care delivery after completing his work for the day and clocking out, he shall be paid a flat fee of $25.00 for each emergency delivery or 1 1/2 times the actual hours

worked, whichever is greater. Call-outs timed on a home to home basis.

## Section 11.   TEMPORARY TRANSFER

11.1   Any employee covered by this Agreement may be temporarily transferred to other classifications or may be used for relief of employees under other classifications.

11.2   If temporarily transferred to a higher paid classification, for other than training purposes, an employee shall receive the rate applicable to the higher classification for all work performed in the higher classification.

11.3   If an employee is temporarily transferred to a lower paid classification, he shall continue to receive his regular rate of pay unless such transfer is made permanent; provided, however, that a transfer to a lower paid classification made at the request of or for the convenience of the employee shall not be deemed a temporary transfer regardless of the duration of such transfer and shall be paid for at the rate applicable to the work being performed.

11.4   The senior employee within the department shall be used for temporary transfers to higher rated jobs when such employee is available and qualified to perform the job.

## Section 12.   SHOP STEWARDS AND ASSISTANT BUSINESS AGENTS

12.1   The Union shall have the right to appoint a maximum of five (5) regular employee as Shop Stewards, limited to one (1) to a department or group of related departments, to provide equitable representation.   The Union may also appoint a total of two (2) Assistant Business Agents.   The Union shall notify the Employer in writing of the names of all Shop Stewards and Assistant Business Agents and the departments they represent prior to posted notice of appointment but within thirty (30) days after the date of signature of this Agreement and within thirty (30) days from the dates of vacancies occurring during the term of this Agreement.

12.2   Shop Stewards and/or Assistant Business Agents shall report to the Union violations of this agreement and shall assist members in the handling of grievances.   They shall be allowed a reasonable amount of time during working hours with the proper authorization from Management. The Shop Stewards or Assistant Business Agents shall not interfere with the management of the Employer's operations or direct the work of any employee.

12.3   No Shop Steward or Assistant Business Agent shall have the authority to call a strike, cause a slow-down, or take any other action which would interrupt the Employer's business

during the term of this Agreement.  No Shop Steward or
Assistant Business Agent are authorized to change, amend, or
modify any terms of this Agreement.

12.4   The Shop Steward and/or Assistant Business Agents shall
also serve as members of the negotiating committee.   It is
further understood that the Company will not pay wages for any
hours spent in their service on the negotiating committee.

## Section 13.   NO STRIKES OR LOCKOUTS

13.1   The parties hereto agree that during the term of this
Agreement there shall be no lockout by the Employer, nor any
strike, sit down, refusal to work, stoppage of work, slowdown,
retardation of production or picketing of the Employer on the
part of the Union or its representatives or on the part of any
employee covered by the terms of this agreement.

## Section 14.   PICKET LINE

14.1 It shall not be a violation of this agreement and shall
not be cause for discharge or disciplinary action in the event
an employee refused to enter upon any property involved in a
lawful primary labor dispute or refuses to go through or work
behind any lawful primary picket line, including the lawful
primary picket line of this Union, and including the lawful
primary picket lines at the Employer's place of business
except that any Medical Facility serviced by Airgas and the
transport/delivery of medical products shall be exempt from
this article.

14.2 It shall not be a violation of this agreement and shall
not be cause for fines, charges, sanctions or any other
disciplinary action by the Union in the event an employee
chooses to enter upon any property involved in a lawful
primary labor dispute or chooses to go through or work behind
any lawful primary picket line, including the lawful primary
picket line of this Union, and including the lawful primary
picket lines at the Employer's place of business.

## Section 15.   DISCIPLINE OR DISCHARGE

15.1 Employees shall be subject to discharge or discipline by
the Employer for various reasons including, but not limited to
insubordination, dishonesty, drunkenness while at work or
working under the influence of alcohol or drugs,  pilferage,
incompetency, illegal gambling, illegal drug use, possession
or sale of illegal drugs on Company premises or in Company
vehicles, smoking in unauthorized areas, failure to report an
accident immediately, willful destruction of the Employer's
property, using a Company vehicle for personal use without
permission,  violation of any of the terms of this Agreement,
or failure to perform work as required, or failure to observe

safety rules and regulations or avoidable accidents, or the Employer's house rules, which shall be conspicuously posted. Such rules shall not violate the provisions of this Agreement. An employee who is discharged shall, upon request, be furnished the reason for his discharge in writing.

It is further agreed that just cause for discharge or other discipline is not limited to the reasons set out above.

15.2   No discipline written notice which has not been given to the Union and the employee, nor any discipline which has been given more than twelve (12) months prior to the current act, except in the case of avoidable accidents where twenty-four (24) months will be applied, shall be considered by the Employer in any subsequent discharge, suspension or other disciplinary action.

## Section 16.   BULLETIN BOARD

16.1   The Employer will provide space for a bulletin board conveniently located at each of its plants (Kalihi, Barber's Point, Island of Hawaii) for the Union's use in posting official Union notices. No strike notices may be posted. It is further provided that notices pertaining to other than regular Union business will be submitted to the Employer for approval in advance of posting.

## Section 17.   GRIEVANCE PROCEDURE

## Employer cannot file a grievance — Only Union may submit matters for arbitration.

17.1   When an employee covered under the terms of this Agreement or when the Union believes that the Employer has violated the express terms or conditions thereof and that by reason of such violation his or its rights arising out of this Agreement have been adversely affected, he or it, as the case may be, shall be required to follow the procedure hereinafter set forth in presenting the grievance and having the grievance investigated and the merits thereof determined.

17.2   The first step in the grievance procedure must be taken within ten (10) working days after the alleged breach of the express terms and conditions of this Agreement. Any grievance involving an alleged continuing situation or alleged series of repeated identical incidents must be presented to the Employer within ten (10) working days following the date on which the situation or incident last occurred. Grievances over amount of compensation shall be deemed to have occurred at the time payment is made. The complaint waives the remedy given by this section if he or it fails to present the grievance within

the prescribed time limit or fails to follow the steps of the
grievance procedure.

17.3   If the Employer's representatives fail to answer
within the time specified in any step, the grievance shall be
deemed unadjusted and the complainant may take the next step
to secure a determination of its merits.

17.4   Step 1 -- <u>Immediate Supervisor</u>.   The grievance in the
first instance shall be presented to the immediate supervisor
within ten (10) working days of the alleged breach of the
express terms and conditions of this Agreement.

17.5   Step 2 -- <u>Department Head</u>.   If the immediate
supervisor does not adjust the grievance to the complainant's
satisfaction within three (3) working days from the time the
grievance is submitted to him, then the complainant may
present the alleged grievance to his department head.
Presentation to the department head shall be made in writing
and must be made within the next three (3) working days.

**<u>The written grievance shall contain the following and
will be prepared by the Union:</u>**

    **(a)   <u>Statement of the specific provisions of the
       Agreement alleged to be violated;</u>**
    **(b)   <u>Date(s) on which the alleged violation occurred;</u>**
    **(c)   <u>Brief description of violation that occurred;</u>**
    **(d)   <u>Specific remedy sought.</u>**

17.6   Step 3 -- <u>President</u>.   If the department head does not
adjust the grievance to the complainant's satisfaction within
five (5) working days from the time the grievance is submitted
to him, then the complainant may present the alleged
grievance, as previously set forth in writing, to the
President or his designated representative.   Presentation to
the President must be made within the next five (5) working
days.

17.7   Step 4 -- <u>Grievance Committee</u>.   If the President or
someone designated by him does not adjust the grievance to the
complainant's satisfaction within five (5) working days from
the time the grievance is submitted to him, then the
complainant may present the alleged grievance, as previously
set forth in writing, to the grievance committee as
hereinafter provided.   Presentation to the grievance committee
must be made within the next five (5) working days.

17.8   A grievance committee shall be appointed, to consist of
two (2) representatives designated by the Employer and two (2)
representatives designated by the Union.   Such committee of
four (4) shall not act in a representative capacity but shall

act only in committee and shall have the power to settle and adjust grievances, and the decision reached by the majority of the committee shall be final and binding upon the parties hereto.

17.9   Step 5 - Arbitration.   If the grievance committee is unable to reach a majority decision within five (5) working days from the time the grievance is submitted to it, then the alleged grievance, as previously set forth in writing, may be submitted to an arbitrator as hereinafter provided. Presentation for arbitration must be made within the next ten (10) working days.

**17.10. The Company and the Union agree to create and maintain a permanent panel of five (5) arbitrators. The panel should consist of local arbitrators only, who reside in the State of Hawaii. One (1) arbitrator shall be chosen as follows: A coin flip will determine who strikes from the panel first.  Each party may alternately strike names from the panel and the remaining arbitrator shall serve in the case.**

17.11   The arbitrator shall receive for his services such remuneration as, from time-to-time, shall be acceptable to him and agreed upon by the parties.  All fees and expenses of the arbitrator shall be borne equally by the complainant and the Employer.  Each party shall bear the expenses of the presentation of its own case.

17.12   All decisions of the arbitrator shall be limited expressly to the terms and provisions of this agreement and in no event may the terms and provisions of this agreement be altered, amended, or modified by the arbitrator.  All decisions of the arbitrator shall be in writing and a copy thereof shall be submitted to each of the parties hereto.

17.13   The complainant in every hearing before the arbitrator shall present a prima facie case.  In general, judicial rules of procedure shall be followed in every hearing, but the arbitrator need not follow the technical rules of evidence prevailing in a court of law or equity.  The arbitrator shall make his decision in the light of the whole record and shall decide the case upon the weight of all substantial evidence presented.

17.14   The parties may, by mutual agreement, request the arbitrator to conduct an informal hearing.  An informal hearing shall mean a hearing without a reporter being present to transcribe the testimony of witnesses and argument by representatives of the parties, but in all other respects the foregoing provisions of this section shall be applicable.  In the case of an informal hearing, the decision of the

arbitrator shall be limited to a written statement of his
conclusions, without comment on the evidence or statement of
the reasons therefore.

17.15 All decisions of the arbitrator under this section
including decisions following informal hearings, shall be
final and binding upon the parties.

17.16 It is expressly agreed and understood that no employee
shall have the right to compel the arbitration of his
grievance without the written consent of the Union.

17.17 The burden of proof in any discipline or discharge case
before the arbitrator shall be on the Employer.  The Union or
employee shall have the burden in all other cases.

### Section 18.  SICKNESS AND INDUSTRIAL ACCIDENT BENEFIT PLANS

18.1    Any employee covered by this Agreement shall be
entitled to benefit payments as follows:

18.2    Sickness and Non-Industrial Accident.   Whenever
sickness or injury not covered by the State workers'
Compensation Act causes absence from work, the employee shall
be entitled to sick leave with pay computed on the employee's
regular straight time rate, such pay to start with the second
day of each absence; provided, however, that where the illness
or injury results in hospitalization, sick leave payment shall
start with the first day of such absence.  Such sick leave
shall not exceed in any one (1) year of service, the following
schedule of benefits:

Sick Pay - Fifteen (15) days per year with the first day of
illness unpaid unless or injury results in hospitalization.

Employees will be entitled to use sick leave up to three (3)
days per year, when caring for an immediate family member with
certification from a doctor. Immediate family member is
defined as spouse, child or parent.

Short Term Disability Schedule - Applies to absences resulting
from illness or injury after 5 continuous working days or if
illness or injury results in hospitalization from the first
day.

| Years of Service | Days |
|---|---|
| 0 - 2 | 15 |
| Over 2 but less than 5 | 50 |
| 5 years or more | 115 |

18.3   An employee absent from work because of illness or injury shall notify his supervisor prior to his scheduled starting time, if possible, but not later than noon on the first day of absence. He shall also notify his supervisor of his intent to return to work prior to the end of his normally scheduled work shift of the day preceding the day he is to return to work.

18.4   In order to receive sick benefits, the employee must present a certificate from a physician who shall be a member of the Honolulu County Medical Society, or such other evidence that may be acceptable to the Employer that his absence from work was caused by such illness or injury.  It shall be at the sole discretion of the Employer to determine whether such other evidence is acceptable.  The Employer may, at its discretion and at its expense, require an examination by its own physician before benefits will be paid.

18.5   There shall be no accumulation of any unused sick leave.

18.6   An employee whose illness or injury is caused by his own misconduct shall not be entitled to the benefits of this subsection.

18.7 Industrial Accident any employee, who is disabled as a result of being injured on the job and whose injury fall under the State Workers' Compensation Act and who has been in the employ of the Employer for a continuous period of one (1) year or more, will receive full pay, net of federal and state taxes, during the period of disability, as determined by the Bureau of Workers Compensation. The Employer shall make up the difference between the employee's straight time earnings, net of federal and state taxes, and the amount allowed by the Workers' Compensation Act, but not to exceed eighty (80) hours of straight time pay for employees covered by this Agreement in any one calendar year.

18.8 If workdays lost by reason of an industrial accident exceed the equivalent of eighty (80) straight time hours, the injured employee may apply unused allowable sick leave days to make up the difference between the employee's straight time earnings, net of federal and state taxes, and the amount allowed by the Workers Compensation Act. It is understood that sick leave means the number of days as described above and is not to be construed to mean unused hours. Each such sick leave day so applied shall reduce the maximum sick leave day allowable by one – third (1/3) day of the same amount under this section.

18.9 Employees shall receive an incentive bonus for no work days missed according to the following schedule:

Up to one (1) day missed - two (2) extra floating holidays with pay.

Two (2) days missed - one (1) extra floating holiday with pay.

Three (3) or more days missed - not eligible for extra floating holidays.

Days missed include:
* The first day unpaid under sick leave
* Sick pay or supplement to workers compensation
* Short term disability
* Other absences not approved in advance except emergencies

Extra floating holidays will be scheduled using the same procedure as normal floating holidays as outlined in section 19.2. Extra floating holidays will be credited on the first day of the following year.

18.10   Sick Leave.   Section 18 of the agreement shall be applicable to regular part-time employees except that the following formula shall be used to compute sick benefits:

$$\frac{2080}{\text{Number of sick leave days provided respective to years of service}} = \frac{\text{Number of straight time hours paid in previous 12 months}}{\text{Number of days sick leave}}$$

Daily sick leave pay will be the same as the number of hours worked on the last previous workday but shall not exceed eight (8) hours. Sick leave pay will be paid only for the employee's regularly scheduled workdays.

18.11   The Employer agrees that it will not hire temporary outside labor services unless required to temporarily replace employees absent due to illness, injury, vacation or other short-term emergency leaves.

18.12   FMLA An employee will be granted a Family Medical Leave of Absence (FMLA) in accordance with applicable Federal and State law upon written request to his supervisor. Employees will be required to substitute accrued paid leave (i.e. vacation)for unpaid FMLA leave.

Section 19.   HOLIDAYS

19.1   Employees shall receive eight (8) hours pay at the regular straight time rate for the following holidays falling Monday through Saturday, provided the employee works the regularly scheduled workday immediately before and the

regularly scheduled workday immediately after the holiday, unless excused by the Employer.

| | |
|---|---|
| New Year's Day | Veterans' Day |
| Memorial Day | Thanksgiving Day |
| Kamehameha Day | Independence Day |
| Day After Thanksgiving* or Presidents Day* | |
| Labor Day | Christmas Day |

(3)   Floating Holidays

*Each employee shall receive either the Day After Thanksgiving or Presidents Day as a Holiday. The Company reserves the right to define the number of employees needed on each holiday based on business needs.

19.2 Floating holidays may be scheduled by employees with at least two weeks notice to management.  Floating holidays will be scheduled with consideration for the needs of the operation.  All newly hired employees will not be entitled to floating holidays until one full year of continuous employment has been achieved.

19.3   If required to work on any of the foregoing holidays, employees shall all receive, in addition to holiday pay, pay at one and one-half (1 1/2) times the straight time rate for work performed for the first eight (8) hours, and double time and one-half (two and one-half (2 1/2) times the regular straight time rate) for hours worked in excess of eight (8) hours on such holidays.

19.4   Whenever the above-listed holidays fall on a Sunday, the following Monday shall be considered the holiday.

19.5   Whenever the above-listed holidays fall on a Saturday, the preceding Friday shall be considered the holiday.

19.6   An employee shall receive credit for weekly overtime purposes for any of the above holidays which fall within his regularly scheduled workweek, regardless of whether or not work is performed on such holiday.

19.7   In the event any of the above-listed holidays falls during a period which an employee is on paid sick leave, as provided in Section 18 (Sickness and Industrial Accident Benefit Plans), such employee will receive holiday pay for such day and will not be charged for a day of used sick leave.

19.8 In the event any of the above-listed holidays falls during a period which an employee is on disability leave covered under State Workers' Compensation Law, and when such

employee is receiving full compensation as provided in Section 18 (Sickness and Industrial Accident Benefit Plans) of this agreement, such employee will receive holiday pay in lieu of any supplemental benefits as provided in Section 18.

19.9 In the event any of the above-listed holidays falls during an employee's annual military leave, such employee will receive holiday pay for the day.

19.10 Provisions for holidays as stated in Section 19 of the agreement shall be applicable to regular part-time employees who would normally have been scheduled to work on said holiday except that the number of hours of holiday pay due will be the same as the number of hours worked on the last previous workday but shall not exceed eight (8) hours.

### Section 20.   UNIFORMS AND SAFETY BOOTS

20.1 The Employer shall furnish uniform shirts for all employees as may be needed and shall be replaced in a reasonable time by the Employer on a one-to-one basis. Employees are required to wear such shirts at all times during working hours and shall not wear such uniforms other than in performance of their normal work.

20.2 The Company will reimburse up to Seventy-Five Dollars($75.00) towards the cost of safety boots.

### Section 21.   COFFEE BREAK

21.1 The Employer shall schedule a fifteen (15) minute coffee break during the morning and a ten (10) minute coffee break during the afternoon for all employees who can take them without interfering with their scheduled work.

### Section 22.   VACATIONS

22.1  As of January 1 of each year, each employee who has had one (1) or more years continuous service with the Employer will become eligible for a vacation in accordance with the following schedule:

| Years of Continuous Service | Vacation Amount |
|---|---|
| 1 years  -  2 years | 1 week |
| 3 years  -  8 years | 2 weeks |
| 9 years  - 15 years | 3 weeks |
| 16 years - 24 years | 4 weeks |
| 25 years | 5 weeks |

22.2  As of January 1 of each year, each employee who has less than one (1) year of continuous service with the Employer will become eligible for a vacation period, computed to the nearest hour, on the basis of one-twelfth of the annual

vacation allowance for each complete calendar month of service.

22.3 At the beginning of each calendar year, each supervisor shall prepare a vacation schedule for the employees in his department.   The expressed preference of the employees, in order of their departmental seniority, will be given due consideration; however, the Employer reserves the right to determine the period during which vacations will be granted each employee.

22.4 Vacation pay shall be based on the employee's then current straight time rate in effect when the vacation is taken.   Vacation checks will be distributed to the employee's on Friday before the start of their vacation period.

22.5 A supervisor may, if operating conditions permit and approval is granted one (1) week in advance, grant an employee a split vacation when requested.   The minimum time to be granted for this shall be one (1) day.

22.6 A regular employee who has completed at least one (1) year of continuous service and is terminated from employment due to permanent layoff, retirement, military draft, death or voluntarily terminates his employment with two (2) weeks notice to the Employer will qualify for payment in lieu of vacation for which he is eligible.   Vacation will be prorated on a calendar year basis. Where a fraction of a month is involved, periods of more than fifteen (15) days shall be considered a full month.   An employee terminated involuntarily from the Company will not qualify for prorated vacation payment.   An employee who voluntarily terminates his employment without two weeks notice will not be paid for pro-rated current vacation for which he would otherwise be entitled.

22.7 An employee who is absent due to industrial injury, or an illness for which he is entitled to sickness benefits, at the time he is scheduled to receive his vacation will not be placed in a vacation status.   Upon recovery, or at the expiration of available sickness benefits, he will either be placed in a vacation status for the balance of his scheduled vacation or be assigned a new vacation period.

22.8 In order to receive a full vacation, an employee must have been paid for at least 1600 straight time hours during the year.

22.9 If a paid holiday occurs while an employee is on vacation, such employee shall receive an additional day of vacation with pay, or pay in lieu thereof, at the option of the Employer.

22.10 If an employee is called back to work during his vacation period, he shall receive his vacation days lost at a later date. Work performed by an employee when he is called to work during his vacation period shall be paid for at the overtime rate.

22.11 In the event an employee is hospitalized during his vacation period, such days will not be considered vacation days. In such cases, the employee shall be placed on sick leave, and vacation days lost because of hospitalization will be taken at the end of the scheduled vacation period or shall be rescheduled for another time at the Employer's option. Hospitalized employees shall notify the Company at the beginning and end of the hospitalized period and provide the Employer with a certificate thereof.

22.12     Vacations may be accumulated at the rate of one (1) week per year, with a maximum accumulation of three (3) weeks. However, the Employer may buy back current and/or accumulated vacation if agreed to by the employee.  It is understood and agreed that each employee shall take a minimum of two (2) weeks vacation per year in order to qualify for the buy-back provision.

22.13 The following prorated benefits shall be afforded regular part-time employees:

(a)  After completion of one year's service on a regular part-time basis, employees shall be entitled to a vacation based on the following formula:

Number of straight time hours paid in

$$\frac{1600 \text{ hours}}{10 \text{ days}} = \frac{\text{previous 12 months}}{\text{Number of days vacation due}}$$

   (b) Employees with ten (10) but less than twenty (20) years of regular part-time service shall be entitled to a vacation based on the following formula:

Number of straight time hours paid in

$$\frac{1600 \text{ hours}}{15 \text{ days}} = \frac{\text{previous 12 months}}{\text{Number of days vacation due}}$$

(c)  Employees with twenty (20) or more years of regular part-time service shall be entitled to a vacation based on the following formula:

Number of straight time hours paid in

$$\frac{1600 \text{ hours}}{20 \text{ days}} = \frac{\text{previous 12 months}}{\text{Number of days vacation due}}$$

22.14   Part-time employees hired after 12/1/85 shall have their prorated vacation based on the schedule provided for new hires.

## Section 23.   LEAVE POLICY

23.1   A leave of absence with or without pay, for a reasonable period of time, but not to exceed twelve (12) months, may be granted to full time employees.  The actual length allowed will be determined on the basis of the facts of each case and the anticipated operating conditions of the Employer.

Leaves of absence will normally be granted for the following:

23.2   Leave of Absence for Union Business.   Any employee elected or appointed to office in the Union which requires all of the major part of his time in the discharge of its duties shall be given a leave of absence for one (1) year without pay.  Such employee shall continue to accrue seniority during such leave of absence.  The leave may be extended by mutual agreement.  It is agreed that not more than one (1) employee of the Employer shall be on such leave of absence at any one (1) time.

23.3   Funeral Leave.   Leave with pay as a result of the death of a member of an employee's immediate family shall be granted up to the limits specified in the following schedule:

    (1)   On Island of Employment - three (3) days
    (2)   Off Island of Employment, if employee leaves the
          Island - four (4) days
    (3)   Outside the State of Hawaii, if employee leaves
          the State - six (6) days

23.4   For purposes of this section, the immediate family shall mean the employee's spouse, parent, child, brother, sister, current mother-in-law, current father-in-law, current son-in-law, current daughter-in-law, grandparent, or grandchild.

23.5   Funeral leave (as provided in Section 23.3 of this agreement) shall also apply when an employee is on vacation.

23.6   Leave of Absence without Pay.   The granting of leaves of absence without pay is a privilege rather than a right to which employees are entitled.  The request must be made directly to the immediate supervisor who has authority to grant two (2) days' leave or less when the request is reasonable.  Requests in excess of two (2) days but not in excess of five (5) days must be approved by the appropriate Vice President.

23.7   Regular employees who have completed one (1) year of service may be granted a leave of absence without pay, for a reasonable purpose, with the appropriate Vice President's approval, for a period not to exceed six (6) calendar months.

23.8   Employees taking military leave for the purpose of performing annual active duty training will use vacation time if that employee has earned in excess of three weeks vacation. However, that employee will be entitled to take at least three weeks vacation before being required to use vacation time.

### Section 24.   JURY DUTY

24.1 Employees required to be absent from their employment to serve on a jury shall be paid their regular straight time wages minus any jury pay and mileage allowance received for such service. Such absence shall be supported by a statement signed by the Clerk of the Court certifying as to the actual time spent in required attendance.

24.2 Employees are required to report to work when a reasonable amount of working time, either before or after jury duty, is available.

24.3 Such absence on jury duty shall not be counted against an employee's credit for vacation or sick leave.

### Section 25.   HOSPITAL-SURGICAL-MEDICAL-DENTAL PLAN

25.1 Effective on the first day of a month as mutually agreed by Company and Union following execution of this agreement, the Employer shall pay on behalf of each eligible participating employee who has completed one (1) continuous month of service with the Employer and for eligible dependents of such participating employees, a contribution to the Hawaii Teamsters Health and Welfare Trust Fund according to the table below:

(1)  **During the term of this Agreement** the contribution rate maximum for the Company will be $900/month/eligible employee.

To the extent that the contribution rates set by the Trustees exceed the maximums set forth above, Company and Union agree that the excess amount will be shared equally by Company and employee.  The employee's share will be added to the monthly contribution established below effective with the date of increase.

25.2  All employees are required to participate in the cost of their Health & Welfare plan by monthly contribution according to the table below.  These contributions will be made via payroll deduction on a pre-tax basis.

26

| Employee Coverage Election | Employee Monthly Contribution effective 2009 Plan year **through term of Agreement** |
|---|---|
| Single | $50 |
| Employee + 1 | $80 |
| Family | $110 |

25.3 Employee is required to notify the Company should there be any change to the number of dependent(s) covered by the Trust. This notification is required to be in writing on a form provided by the Company and within thirty (30) days of the change. The Company will then notify the Hawaii Teamsters Health and Welfare Trust Fund of the change.

25.4 During the life of this contract, the Employer has the right to propose any comparable or better medical plans to the Union. With the approval of the Union, the Employer has the right to change current medical plans, Prescription Drug and Vision Care Riders.

## Section 26.    FLEXIBLE SPENDING ACCOUNTS

26.1 The Company will offer Flexible Spending Accounts for unreimbursed medical expense and for dependent care.

• Medical – Employee can contribute pre-tax to an account that will reimburse them for the unreimbursable portion of their health care expenses. Employer will contribute a maximum of $100 to employee's account.
• Dependent Care – Employee can contribute pre-tax into an account that will reimburse them for dependent care.

These accounts will be offered in accordance with then current IRS regulation.

## Section 27.    DISABILITY INSURANCE

27.1 The Employer will make available the AIRGAS Group Long Term Disability Plan beginning on the first of the month following the date of hire unless hired on the first day of the month. Benefits shall start after twenty-six (26) consecutive weeks of total disability as a result of sickness or injury. The cost of the plan is paid by the employee.

27.2 The disability insurance will not be continued if said insurance is a duplicate of benefits as provided in the Western Conference of Teamsters Plan and Social Security provisions.

**Section 28.     GROUP LIFE INSURANCE**

28.1  The Employer will provide at no cost to the employee $30,000 Group Life, and Accidental Death & Dismemberment Insurance. Employees may elect to continue in the current contributory Group Life, Accidental Death and Dismemberment Insurance.

**Section 29.  Union Supplemental 401k Plan**

29.1 Participation in the Western Conference of Teamster Trust fund shall terminate on December 31, 2009 and will be replaced by a Union Supplemental 401K plan effective January 1, 2010.   (Union Supplemental 401K fund Subscribers agreement is attached.)

29.2 Beginning January 1, 2010 the Company shall pay on behalf of each member having completed probationary period as of January 1, 2010 a contribution of three dollars per hour ($3.00/hour) for straight time wages paid, not to exceed 40 hours per week, into the 401K plan; paid quarterly on or about the following dates: March 31, 2010, June 30, 2010, September 30, 2010, December 31, 2010, March 31, 2011, and a final monthly payment on April 30, 2011.

29.3     The Employer's obligation under this article shall cease as a matter of contract and law upon expiration of this agreement or any extensions thereof and contributions will no longer be required from the Employer unless and until a renewal contract is reached requiring same.

29.4 Nothing herein prevents the Union from bargaining the Employer's subsequent participation and contributions into the Union Supplemental 401K plan in any renewal agreement.

### Section 30.   WAGES

30.1 Attached hereto and made a part of this agreement is the minimum wage schedule, marked Exhibit "A", which shall be effective during the term of this agreement.

30.2
Employees hired after December 1, 1985, wage rate schedule:

|  |  |
|---|---|
|  | **First Year** |
| 70% of current classification rate | 1st 6 months |
| 75% of current classification rate | 2nd 6 months |
|  | **Second Year** |
| 80% of current classification rate | 3rd 6 months |
| 85% of current classification rate | 4th 6 months |
|  | **Third Year** |
| 90% of current classification rate | 5th 6 months |
| 95% of current classification rate | 6th 6 months |

Remain at 95% for one (1) more year then increase to current contract wage rate (4 years for parity).

30.3 All employees are required to be on Direct Deposit.

### **30.4 Company shall provide to each unit member having completed probationary period as of December 1, 2009 a bonus of Five Hundred dollars ($500.00).**

### Section 31.   SEPARATION ALLOWANCE

31.1 A regular full-time employee who has completed one (1) or more years of continuous service and who is permanently terminated from service for reasons clearly beyond his own control due to a permanent reduction in the work force shall receive a separation allowance to be determined in an amount as follows:

| Years of Continuous Service With The Employer | Separation Allowance |
|---|---|
| 1 through 10 | 40 hours at his then current straight time rate of pay for each completed year. |
| 11 through 15 | 50 hours at his then current straight time rate of pay for each completed year in excess |

29

|                   |                                                                                                                          |
|-------------------|--------------------------------------------------------------------------------------------------------------------------|
|                   | of 10 (in addition to the above).                                                                                        |
| 16 through 20     | 55 hours at his then current straight time rate of pay for each completed year in excess of 15 (in addition to the above). |
| Over 20           | 60 hours at his then current straight time rate of pay for each completed year in excess of 20 (in addition to the above). |

31.2 Such a separation allowance will not be paid in the event of resignation, discharge, retirement or death.

31.3 The Employer shall determine at time of layoff whether or not it is expected to be a permanent termination and, if it is not so expected, the employee will not receive such a separation allowance.

31.4 In order to be eligible for such separation allowance, an employee shall forfeit all seniority rights and any other privileges, rights, or benefits which such employee shall have at the time of termination. If re-employed, he shall be considered a new hire and shall have the status assigned to him at the time of re-employment.

31.5 Any regular full-time employee who is eligible for a separation allowance, as specified above, shall in addition receive a pro rata vacation from the first of the calendar year to the effective date of his termination from the Employer.


## Section 32.   MEDICAL EXAMINATIONS

32.1 All medical examinations required by the Employer of applicants or employees shall be at the Employer's expense and, in the case of employees, on the Employer's time.


32.2 DRUG TESTING.

All new employees will be tested for illegal drug use. All current employees will be tested for the following reasons:

> a. As part of the regularly scheduled bi-annual D.O.T. physical.

Dec. 16. 2009  8:04AM                                                No. 1697   P. 11/11

b. When employees are involved in major vehicle accidents and/or major property damage accidents.

c. As part of a rehabilitation program.

d. In the case of an employee's conduct that would indicate to a supervisor reasonable cause to suspect substance abuse

The full policy and procedure for Alcohol and Drug Abuse is contained in Exhibit E of this Agreement. The employer reserves the right to modify the Alcohol and Drug Testing policy contained in this section and Exhibit E to conform to any changes in DOT regulations (New section to Exhibit E covering drivers (CDL/FHWA) added November 1, 2000.)

## Section 33.   BARGAINING UNIT WORK

33.1 Management may perform incidental bargaining unit work for bona fide reasons such as for training and instructional purposes, maintenance and operational check of equipment and systems, in cases of imminent safety risk, and to facilitate customer needs. The performance of this work will not be to deprive laid off employees of work nor active employee's significant overtime opportunity. In the event any bargaining unit work is performed under the terms of this article, the Union will be notified not more than ten (10) days from the start of the event. It is further agreed that the Union will have the opportunity to file a grievance if it feels the work was not done for one of the bona fide reasons above.

## Section 34.   SUBCONTRACTING

34.1 The Employer agrees that it will not initiate any sub-contracting which will cause any reduction in its work force or which will delay the recall of employees on layoff, unless such subcontracting is reasonably required. The Union will be notified and given the opportunity for discussion of such action.

34.2 The Employer will offer work involving the unloading of ocean-going containers to employees currently on the payroll prior to using outside labor services for such work.

## Section 35.   TRAVEL

35.1 Employees who are required to work outside of Oahu shall be furnished transportation. Commercial accommodations shall be supplied. However, it is understood that government furnished accommodations may be expected when no commercial accommodations are available, or when government furnished accommodations are enforced under the terms of the contract for the work.

35.2 Transportation of any personal baggage exclusive of tools required by the Employer in excess of the weight and size of that included in the normal fare shall be paid for by the employee, unless he receives express permission from the Employer to take excess baggage.

35.3 Employee shall be reimbursed for reasonable traveling expenses incidental to the trip.

35.4 The Employer and/or customer shall provide reasonable board, lodging and laundry to employees required to work away from Oahu; or a per diem of Fifty Dollars ($50.00) may be advanced.  If expenses exceed $50.00, the employees will be required to submit an expense report and receipts for all money spent.  It is not the intent of the Employer that employees shall make or lose money as a result of payment of per diem.  Adjustments, if needed, will be made upon return to the island of employment, and submitting the expenses to the Employer.

35.5 If required, the Employer shall provide local surface transportation from the hotel to the work site, or if more than one employee is involved and are domiciled at different locations, the surface transportation shall be provided from a central location.

35.6 The Employer will provide mileage for personally owned vehicles according to allowable Internal Revenue Service mileage schedule.

35.7 The Employer shall allow an employee working on the outer islands Monday through Friday a paid trip to visit his family and return when it is not necessary for him to work during the weekend.

35.8 All hours worked over eight (8) hours per day while traveling must be authorized by the supervisor in advance.

35.9 When an employee goes to an outer island, his time starts one-half hour prior to the time of the scheduled flight.  If he returns the same day, his time stops upon arrival or picking up of baggage, whichever is later.  If he is required to stay overnight, his time stops when he leaves the job site.

35.10 Nothing in the above shall be construed as taking away any benefits or past practices the employee now enjoys relating to travel.

### Section 36.    PARKING

36.1 It is understood and agreed that should it become necessary for the Employer to make any changes to existing availability of parking for the employees covered by the

Agreement, the matter shall be thoroughly discussed with the Union at least sixty (60) days prior to change and possible impact on the employees shall be given due consideration.

### Section 37.    MASCULINE MEANS FEMININE

37.1 Whenever in this Agreement the masculine gender is used, it shall be deemed to include the feminine gender.

### Section 38.    MODIFICATION OF AGREEMENT

38.1 No provision or term of this Agreement may be amended, modified, changed, altered, or waived except by written document executed by the parties hereto.

### Section 39.    SEPARABILITY

39.1 In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction or through government regulations or decree, such decision shall not invalidate the entire Agreement, it being the express intention of the parties hereto that all other provisions not declared invalid shall remain in full force and effect.

### Section 40.    DOCUMENT CONTAINS ENTIRE AGREEMENT

40.1 This Agreement incorporates the complete understanding between the Company and the Union, and there are no verbal or unwritten understandings in respect to working conditions, hours of work, rates of pay or any other matters covered by this Agreement.

40.2 The parties acknowledge that during the negotiations which resulted in this Agreement each had the unlimited right and opportunity to make demands and proposals, with respect to any subject or matter not removed by law from the area of collective bargaining, and that understandings and Agreement arrived at by the parties after the exercise of the right and opportunity are set forth in this Agreement.

### Section 41.    MANAGEMENT RIGHTS

41.1 Except as expressly limited by other articles of this agreement, it is understood and agreed that all power and rights related to the management and control of the business rest exclusively with the Company.

41.2  These powers include, by way of illustration and not limitation are; the power to establish and maintain efficiency and quality standards, to adopt Company rules; to determine

the size of the work force, to engage in Corporate planning
and direction, to purchase and sell equipment, to engage
businesses to assist in meeting Corporate objectives, to hire,
promote, transfer, suspend, discipline or discharge for just
cause, to layoff or relieve employees from duty because of
lack of work or for other legitimate reasons, to determine the
operations or services to be performed, if any, in or at the
facility or by the employees of the Company, to schedule the
working hours, to introduce new and improved methods,
materials, or facilities, or to change or delete existing
methods, materials, or facilities.

41.3   The exercise or non-exercise of the rights retained by
the Employer shall not be deemed to waive any such rights or
the discretion to exercise any such rights in some other way
in the future.

### Section 42.   MILITARY SERVICE

42.1   Employees enlisting or entering the military or naval
service of the United States, pursuant to the Uniformed
Services Employment and Reemployment Rights Act of 1994
(U.S.E.R.R.A.) shall be granted all rights and privileges
provided by the Act.

### Section 43.   REIMBURSEMENT FOR HAZMAT ENDORSEMENT

43.1   Any employee who is required to have a Hazmat
endorsement for the position they hold with the Company shall
be reimbursed for the costs associated with updating the
endorsement.

### Section 44.   MISCELLANEOUS

**44.1A Managerial Associate should be on duty and/or
otherwise available as long as a unit members are
working for the Company.**

### Section 45.   DURATION

45.1   This Agreement shall be binding upon the respective
parties from **January 1, 2010, to and including April
30, 2011,** and shall be considered as renewed from year to
year thereafter unless either party hereto shall give written
notice to the other of its desire to modify, amend, or
terminate the agreement at least sixty (60) days prior to the
expiration date but not more than ninety (90) days prior to
the expiration date.

IN WITNESS WHEREOF, the parties hereto through their duly authorized representative have executed this agreement on the 23rd day of December , 2009.

AIRGAS WEST, INC.

HAWAII TEAMSTERS AND ALLIED WORKERS - LOCAL NO. 996

## AIRGAS WEST, INC.

### "EXHIBIT A"
### HOURLY WAGE AND CLASSIFICATION

| TRUCKING DEPARTMENT | 1/1/2010 | 11/1/2010 |
|---|---|---|
| Truck Driver - Salesman | 20.27 | 20.52 |
| Tractor Driver | 20.37 | 20.62 |
| Liquid Transport Driver | 20.97 | 21.22 |
| Auto & Truck Mechanic | 21.09 | 21.34 |
| Service Engineer | 21.45 | 21.70 |
| Lead Driver/Trainer | 22.88 | 23.13 |
| CDL Certification ** | | |

| WAREHOUSE DEPARTMENT | | |
|---|---|---|
| Utility Helper | 17.80 | 18.05 |
| Utility | 20.12 | 20.37 |
| Warehouse Clerk | 20.65 | 20.90 |
| Working Foremen | 21.43 | 21.68 |
| Foreman | 23.83 | 24.08 |

| LIQUID & GASES DEPT (KALIHI AND BARBER'S POINT) | | |
|---|---|---|
| Utility Helper | 17.80 | 18.05 |
| Ice Packer | 19.45 | 19.70 |
| Utility General | 19.90 | 20.15 |
| Cylinder Service/Loader | 20.65 | 20.90 |
| Acetylene/ASU/Co2 Operator | 20.72 | 20.97 |
| Shift Engineer - Co2 | 21.71 | 21.96 |
| Shift Engineer - O2N2H2 | 21.77 | 22.02 |
| Industrial Gas Filler | 20.40 | 20.65 |
| Medical Gas Filler | 20.70 | 20.95 |
| Special Gas Technician | 21.40 | 21.65 |
| Working Foremen - Prod Plants | 22.05 | 22.30 |
| Foreman-Cyl.Svc/Acetylene/Maint. | 24.08 | 24.33 |
| General Maintenance 3/c | 20.27 | 20.52 |
| General Maintenance 2/c | 20.73 | 20.98 |
| General Maintenance 1/c | 21.44 | 21.69 |
| Spec Gas Tech/Quality Assurance | 24.08 | 24.33 |
| Foreman-B.P. Prod. Plant/Maint. | 24.08 | 24.33 |
| Electrician | 26.05 | 26.30 |
| Distribution/Plant Maint. Foreman | 24.08 | 24.33 |

| PRODUCTION MAINTENANCE DEPARTMENT | | |
|---|---|---|
| Utility Helper | 17.80 | 18.05 |
| Cryogenic Technician 1/c | 23.08 | 23.33 |
| Cryogenic Technician 2/c | 22.67 | 22.92 |
| Cryogenic Technician 3/c | 22.02 | 22.27 |

** Driver and Loaders required to have CDL certification will be
   paid a premium of $0.25 higher than their classification
wage.

| ISLAND OF HAWAII | 1/1/2010 | 11/1/2010 |
|---|---|---|
| Warehouseman | 20.12 | 20.37 |
| Truck Driver/Utility | 20.32 | 20.57 |
| Tractor/Liquid Driver | 20.70 | 20.95 |
| Dispatcher Foremen ** | 22.38 | 22.63 |
| Homecare/Utility | 17.15 | 17.40 |

CDL Certification **

** Driver & Loaders required to have CDL certification will be paid a premium
of $0.25 higher than their classification wage.

EXHIBIT "B"

ASSIGNMENT OF WAGES TO COVER DUES,
INITIATION FEE AND ASSESSMENTS

TO:

I assign to HAWAII TEAMSTERS AND ALLIED WORKERS, LOCAL 996,
out of my wages the Union initiation fee, monthly dues and not
more than $2.00 per month as assessments, as certified to you
in writing by the Union, and I authorize the payment to the
Union each month of the amount so deducted.

This assignment shall be irrevocable until one (1) year from
the date below, or until the termination date of the
applicable collective bargaining agreement (within the meaning
of the Labor Management Relations Act, 1947), whichever occurs
sooner, and shall be automatically renewed and shall be
irrevocable for successive periods of one (1) year each or for
the period of each succeeding applicable collective bargaining
agreement, whichever shall be shorter; unless at least ten
(10) days and not more than twenty (20) days before the
expiration of each period of one (1) year, or of each
applicable collective bargaining agreement, whichever occurs
sooner, I give written notice to the Employer of my desire to
revoke this assignment, or unless the same shall be
automatically cancelled as provided below.  This assignment is
automatically cancelled when my employment ends or when I
cease to be employed in a capacity represented by the
bargaining unit.

There shall be no obligation on the part of the Employer to
make any deduction beyond the original term of the collective
bargaining agreement existing at the date of this assignment,
unless the agreement is extended or a new agreement has been
negotiated containing an authorization for Union deductions as
provided in the agreement existing at the date of this
assignment.

Date:_____        _____
                                               Employee

Receipt of foregoing assignment is acknowledged:

Date:_____        _____
                                               Employer

By:_____

EXHIBIT "C"

ASSIGNMENT OF WAGES FOR UNION'S NEGOTIATION
AND ADMINISTRATION OF CONTRACT

I hereby voluntarily assign to the HAWAII TEAMSTERS AND ALLIED
WORKERS, LOCAL 996, out of my wages for the Union's
negotiation and administration of the collective bargaining
agreement on my behalf, an initial amount equal to the current
Union initiation fee and a monthly fee in the same amount as
Union dues, as certified to you in writing by the Union, and I
authorize the payment to the Union each month the amount so
deducted.

This authorization shall become effective on the date set
forth below and cannot be cancelled unless I execute an
Exhibit "B" Assignment of Wages to Cover Dues, Initiation Fee
and Assessments, or until the termination of the existing
collective bargaining agreement between the Company and the
Union, whichever occurs sooner.

This authorization shall be suspended during any period in
which there is not collective bargaining agreement in effect
between the Company and the Union.   This authorization shall
end if my employment with the Company ends, or when I cease to
be employed in a capacity represented by the bargaining unit.

DATE: _____        _____
                                            Employee's Signature

Receipt of the foregoing assignment is acknowledged:


                                        _____
                                              Employer
DATE: _____        BY: _____

EXHIBIT "D"


NOTIFICATION OF HIRING, LAYOFF,
TERMINATION AND PROMOTION


TO:  Hawaii Teamsters and Allied Workers, Local 996


Date: _____

The person names _____ has been

hired as _____ on _____

Laid off on _____

Terminated from payroll because _____

_____ on _____

Promoted to _____ on _____

Classification _____ Rate $ _____


**AIRGAS WEST, INC.**


By: _____

No. 1698   P. 11/11                                                    Dec. 16. 2009  8:05AM

## ADDENDUM "E"

### ALCOHOL AND DRUG ABUSE

GENERAL

The Company has a strong commitment to its employees to provide a safe and secure work place and to establish programs promoting high standards of employee health.  The purpose of this policy is to state our philosophy with respect to substance use and abuse and to provide management with practical guidelines for its administration when dealing with employees and applicants.

POLICY

The Company does not condone substance abuse.  It is our expectation that maintaining satisfactory performance is the responsibility of each employee.  The decision to acknowledge substance abuse - related problems and seek assistance is also the responsibility of the employee.  The Company recognized that substance abuse is a treatable problem and we will assist employees by helping them to understand the problem and correct it before it impairs their performance and jeopardizes their employment.

While the Company provides opportunities to employees to correct performance problems related to substance abuse, it will deal firmly with:

- Illegal use, possession, or distribution/sale of drugs or controlled substances.

- Being under the influence of drugs, alcohol or controlled substances to the degree that impairs judgement, performance or behavior while on Company premises or acting as a Company representative off premises.

The above situations will result in disciplinary action up to and including termination.

**Program Education**

An important part of this policy will be education for employees, supervisors, and their families to:

- create an awareness by employees and their families of the impact of substance abuse;

- inform those concerned about the resources available to assist employees in dealing with a substance abuse problem;

- focus on job performance problems, not on diagnosing or counseling for suspected substance abuse.

**Group Insurance**

When rehabilitative assistance or private counseling is extended to employees with substance abuse problems, a portion of the expenses may be reimbursed through the applicable insurance plan for those employees enrolled.

**Employee Assistance Program**

Employees are also covered by The Employee Assistance Program. This program may be initiated by employee self-referrals or supervisory/management referrals.

Any employee who needs the support of such rehabilitative programs can do so voluntarily, in confidence. The employee or supervisor may in confidence directly contact Lifeworks, a personal counseling service. Lifeworks telephone number is 1-(800) 214-6668.

**Identification and Rehabilitation**

Employees' continued employment is dependent upon and satisfactory job performance. Supervisors who suspect substance abuse and initiate referrals to the Employee Assistance Program should do so based solely on job performance without attempting to diagnose substance abuse or any other medical illness.

If an employee admits to substance abuse or it is clinically evident without a satisfactory explanation, (e.g., taking medications prescribed by a physician), the employee will be encouraged to voluntarily enter a rehabilitative program or a private counseling program with periodic re-evaluation by the location's designated physician.

If a physician tells an employee that he/she is unable to continue working because of a substance abuse problem, the supervisor under the advisement of Human Resources, will place the employee on medical leave of absence.

The Company-designated doctor will determine when it is appropriate for employees to return to work after rehabilitative treatment.  To assist the Human Resources Department in follow up after rehabilitation, urine sampling will be requested by the doctor.  The employee must consent in writing to such testing, which is a condition of the return to active employment.  Supervisors should allow a reasonable period of time to correct substandard performance.  Should unsatisfactory performance continue beyond that period, further disciplinary action up to and including termination is appropriate.

Confidentiality

All information obtained in the course of examinations, rehabilitation and treatment of employees with substance abuse problems shall be protected as confidential medical information.  No data concerning this information or participation in any rehabilitative program will be made part of the employee's personnel or will be provided to any other party without the consent or knowledge of the employee, or unless required by law.

Individual
Employee
Testing

Drug and alcohol screening for current individual employees will occur for four reasons:

- As part of the regularly scheduled bi-annual D.O.T. physical.

- When employees are involved in major vehicle accidents and/or major property damage accidents.

- As part of a rehabilitation program.

- In the case of an employee's conduct that would indicate to a supervisor reasonable cause to suspect substance abuse.

Employee written consent will be required for testing and for permission to release results to appropriate management (see attachment Consent form). After receiving notification of results from the headquarters or regional administrator, the supervisor will notify employees of positive test results. Employee's refusal to submit to testing or to release test results to Management, will be the basis for disciplinary action up to and including discharge.

Random Testing

If random controlled substance testing implemented, it will be in accordance with applicable State and Federal laws. Random testing may only be instituted with the prior approval of the Corporate Vice President, Human Resources.

Periodic Testing

Where there is a compelling interest, periodic substance testing may occur. Such testing must be approved by the Vice President, Human Resources. In addition, drivers already employed by AIRGAS WEST, INC. will have a drug screen test when taking their bi-annual D.O.T., physical examination.

Applicant Testing

All applicants to whom the Company offers employment are required to have urine drug screen test. All offers of employment are contingent upon the test results. Positive test results disqualify candidates for consideration for 12 months.

Positive Test Results

- Drivers testing positive during their D.O.T. physical will be required to immediately enter a rehabilitation program or will be discharged.

- Drug and alcohol screening of employees will be required in a serious personal injury accident and in major property damage accidents. A positive test in these cases will result in discharge.

- Upon release from the physician supervising the rehabilitation, drivers will be required to retake the D.O.T. physical including the drug and alcohol screening. To assist in assuring sustained progress in rehabilitation, follow-up drug and alcohol screening will be required until the next scheduled D.O.T. physical.

Follow-up screening for this purpose will not be required more than once every 6 months except for alcohol rehabilitation. The amount of follow-up testing after alcohol rehabilitation shall be determined by a substance abuse professional, but shall consist of at least six tests in the first 12 months following the employee's return to duty. In addition, follow-up testing may include testing for drugs, as directed by the substance abuse professional, to be performed in accordance with 49 CFR part 40. Follow-up testing shall not exceed 60 months from the date of the employee's return to duty. The substance abuse professional may terminate the requirement for follow-up testing at any time after the first six tests have been administered, if the substance abuse professional determines that such testing is no longer necessary.

Failure of any drug or alcohol screening test subsequent to participation in a rehabilitation program will be grounds for termination.

- An employee whose conduct would indicate to a supervisor reasonable cause to suspect substance abuse and who test positive will be required to immediately enter a rehabilitation program or be discharged.

**Laboratory**

The professional drug and alcohol screening laboratory designated by the Company:

- Is responsible for processing, and notifying the proper program administrator of drug screening results.

- Has final authority on interpreting results of drug screening.

- Will have no direct communication with applicants, unless prior authorization has been received from the hiring manager.

- Will maintain confidential, secure records of drug screening and results. Results will only be provided to the Regional or Headquarters Employee Relations Manager.

- Will automatically conduct a second confirming GC/MS test on all positive results as contracted by the Company.

## Administration  –

Drug and alcohol screening is coordinated by Human Resources in Murray Hill and by Regional Employee Relations Managers for field employees. Tests requested by the Company will be performed by an outside, professional laboratory (LabCorp Laboratories, Inc. Holtsville, NY). The involved doctor is supplied kits which are a part of the documented "Chain of Custody" handling system, assuring specimen integrity. Samples are sent to a LabCorp Inc. in pre-addressed mailers via U.S. Mail and the computerized results returned to the Human Resources designee. A notarized document will be issued on all positive tests.

## PROCEDURE AND RESPONSIBILITIES

### Employee's Responsibilities

- Remain free of substance abuse.

- Seek early diagnosis and accept treatment for a substance abuse problem and return to a satisfactory performance level.

### Supervisors' Responsibilities

- Ensure that employees perform satisfactorily.

- Recognize early and discuss with an employee changes in behavior which appear to reflect on the employee's performance.

- Provide counseling on performance problems only and properly document behavior appearance, safety lapses and related discussions, while avoiding diagnosis.

- Make early referral of employees to the Employee Assistance Program when a substance abuse problem is suspected.

- Allow reasonable time for correction of substandard performance, acknowledging an appropriate rehabilitation.

- Apply appropriate disciplinary procedures.

### Management's Responsibilities

- Ensure that policies are followed and individual employee problems are handled sensitively.

Human Resources
Responsibilities

- Ensure the Employee Assistance Program and laboratory services are maintained according to policy.

- Coordinate the utilization of test results.

- Provide guidance to Management and Supervisors in the application of policy.

DEFINITIONS

- "Compelling Interest" is interest that justifies the administration of a drug test for the protection of the employee affected by drug use, of other employees, or of the public.

- "Substance Abuse" means the misuse or illegal use of controlled substance such as marijuana, heroin, cocaine, etc., or alcohol.

- "Chain of Custody" means a method utilized by LabCorp Laboratories to ensure specimen integrity. Integrity of the specimen contributes to the validity of the results by preventing switching of labels on containers, opening of containers after being sealed and altering of test request forms.

# FEDERAL HIGHWAY ADMINISTRATION (FHWA)

## ALCOHOL & DRUG POLICY FOR AIRGAS WEST, INC.

**Applicability:**

Employees subject to the commercial driver's license (CDL) standards must comply with alcohol and drug regulations which are promulgated by the Federal Highway Administration FHWA. (Note: the Regulations pertaining to Alcohol Testing are effective January 1, 1995). This policy sets forth AIRGAS protocol for CDL alcohol and controlled substance testing.

Ping Cheng, Vice President of Operations, Tel: (808) 721-0497, is the designated Company Representative for any questions regarding this Policy.

I.   Prohibitions for alcohol and controlled substances:

   A.   Alcohol

      1.   A driver may not report for duty or stay on safety-sensitive duty[1] :

         a.   with an alcohol concentration of 0.02 or greater;

         b.   if in possession of alcohol;

         c.   if using alcohol;

         d.   within eight (8) hours of using alcohol.

      2.   A driver who has had an accident may not use alcohol until post-accident testing is done or for a period of eight (8) hours, whichever comes first.

      3.   Drivers cannot refuse to submit to alcohol testing. A refusal to test will be treated as if the diver had an alcohol test of 0.04 or greater.

   B.   Controlled Substances:

      1.   Drivers may not report for duty or stay on safety-sensitive duty while using any controlled substance. (The exception to this ruling is if a physician has prescribed the substance and has advised the driver that it does not interfere with the ability to safety operate a motor vehicle).

---

[1]Safety-sensitive functions refer to any time the driver is actually driving, inspecting, servicing, unloading or loading a motor vehicle.
See Section 395.2 of FHWA regulations.

2. Drivers may not report for duty or stay on safety-sensitive duty if they have tested positive for a controlled substance.

II. Required Testing:
   Alcohol:
   A. In order to perform safety-sensitive functions, the driver's alcohol concentration must be below 0.04 (Drivers with test results of 0.02 or over but less than 0.04, cannot perform safety-sensitive functions for at least 24 hours).

   B. Post-Accident Testing - must be completed as soon as practical following an accident where:
      1. A life was lost.
      2. The driver was cited for a moving traffic violation.

      AIRGAS reserves the right to test in situations involving major accidents ($1,000 or more) or third party injuries.

      Post accident testing should be done within two (2) hours of the accident. Drivers must submit to a post-accident testing. If a driver refuses to be tested, he or she cannot continue on the job. A refusal to test will be treated as if the driver had an alcohol test result 0.04 or greater.

   C. Random Testing - drivers are randomly selected using a scientifically valid method that ensures each driver has an equal chance of being tested each time the selections are made. Random testing is done on a percentage basis. The FHWA bases the minimum annual percentage on the violation rate for the entire industry.

      All random testing must be unannounced and the dates for conducting the tests must be spread reasonably throughout the calendar year. Drivers selected for random testing must proceed immediately to the test site. Random alcohol testing can only be conducted just before, during or immediately after performing a safety-sensitive function.

   D. Reasonable Suspicion - The determination to test for reasonable suspicion must be based on:

      1. The observations of a supervisor or Company official who has received the training required in this area.

      2. Specific, clearly stated observations concerning the appearance, behavior, speech, or body odors of the driver.

      3. Observations made just before, during, or just after the performance of safety-sensitive functions. The test must be done within two (2) hours of the observations.

      Drivers cannot report to duty or stay on the job while under the influence of

alcohol or while impaired by alcohol as shown by behavior, speech or performance that indicates alcohol misuse. Employers cannot allow these drivers to continue to perform safety-sensitive functions until:

    a.  The driver's test shows an alcohol concentration of 0.02 or below; or

    b.  Twenty-four (24) hours have passed from the time of the initial observation.

E.  Return-to-duty and follow-up testing:

Return-to-duty alcohol test is required for a driver who violated the alcohol prohibition of the Regulations and is returning to a safety-sensitive function. In order to work the test result must be less than 0.02 alcohol concentration.

Follow-up testing is required for those who return to a safety-sensitive function. This testing can be done just before, during or just after the performance of safety-sensitive functions. A minimum of six (6) unannounced tests are required during the first year back on the job. Follow-up testing cannot exceed five (5) years from the date of the driver's return-to-duty.

F.  Evidential Breath Testing (EBT)

For all types of alcohol breath testing, the regulations call for the use of an EBT device approved by the National Highway Safety Administration. Screening test is done first. If the reading is 0.02 or over, a confirmation test must be done using an EBT device that prints out the results, date and time of the test. The Breath Alcohol Technician (BAT) is a trained and certified expert in the use of the EBT device and testing procedure. The BAT must show the driver the test result as shown on the EBT device. Both the BAT and driver sign and date the test form.

III.  Controlled Substance Testing:  All urine specimens are analyzed for the following drugs:  marijuana, cocaine, amphetamines, opiates, and phencyclidine.

    1.  Pre-Employment Testing - drug test result must be negative.

    2.  Post-Accident Testing - must be completed following an accident where a a life was lost where the driver was cited for a moving traffic violation. AIRGAS reserves the right to test in situations involving major accidents ($1,000 or more), or third party injuries Testing should be done within 32 hours of the accident. A refusal to test is treated as a verified positive test.

    3.  Random Testing - unannounced random drug testing must be completed on 50% of drivers each year. The random selection must be done so that each driver has an equal chance of being tested each time the selections are made.

    4.  Reasonable Suspicion - must be based upon:

  a. Specific, clearly stated observations concerning the appearance, behavior,
   speech or body odors of the driver detected by a trained supervisor.

  b. Observations can be made anytime the driver is at work for the employer; and

5. Return-to-duty drug test is required for those who violated the drug prohibitions
 of the Regulations and are returning to work. A negative test result is required.

6. Follow-up testing is required for those who return to work after a prior positive test.
 A minimum a six (6) unannounced tests are required during the first year back on the job.
 Follow-up testing cannot exceed five (5) years from the date of the driver's return to duty.

## IV. Testing Procedure:

Urine Samples are analyzed at laboratories certified by the Department of Health and
Human Services. The Company has contracted with a professional drug and alcohol

screening Company which is responsible for administration of the chain of custody and
protocol required by governmental regulations. Urine specimens must be divided into
two containers to provide a "split sample". These two samples, called "primary" and
"split", are sent to the testing laboratory in one container. Only the primary container
is opened and used for the analysis. The split sample remains sealed and stored for
future use. A screening test is performed on the primary sample. If this test is positive
for one or more drugs, a confirmation test using the split sample is required for each
drug identified in the screening test. The confirmation test uses a specialized procedure
called "gas chromatography/mass spectrometry. If the primary test sample is positive,
the medical review officer (MRO) notifies the employee to report the positive test and
to determine if there is a medical reason for the drug use.
(If the employee can document why the drug is being taken and if the MRO finds it is a
legitimate medical use, he test may be reported as negative to the employer). The
employee then has 72 hours to request a test of a split specimen. All drug testing
results are interpreted by the MRO. After this review, the results are given to the
employer by any means of communication. Within three (3) days of the review,
however, the MRO must provide the employer with a signed, written notification
of the test results.

## V. Consequences of Positive Test Results:

 A. Alcohol Misuse:
  A driver who has violated any of the prohibitions of the regulations will be
  removed from safety-sensitive functions. The driver cannot return to a safety-
  sensitive function until an evaluation by a substance abuse professional has been
  done and any recommend treatment has been completed. The regulations (CFR 49.40)
  require that drivers be provided with an opportunity for treatment, but do not require
  an employer pay for rehabilitation or hold a job open for a driver. AIRGAS
  reserves the right to review each situation based on the totally of circumstances
  regarding the driver's incident/negligence in a determination
  of the appropriate disciplinary action. If the Company determines a return to work
  is appropriate, a driver found to have an alcohol concentration of 0.02 or over

cannot return to safety-sensitive duties for 24 hours, or until another breath test is negative.

B. Controlled Substance Use:   A driver who has violated any of the prohibitions of the regulations will be removed from safety-sensitive functions. A driver cannot return to safety-sensitive functions until he has been evaluated by a substance abuse professional, completed the recommend therapy, and tested negative for drugs. AIRGAS reserves the right to review each situation based on the totality of circumstances regarding the driver's incident/negligence in a determination of the appropriate disciplinary action.

C. Employee Resources:   All drivers are covered by the Employee Assistance Program (Lifeworks).

Any employee who requests the support of such rehabilitative programs can do so voluntarily, and confidentially, without the possibility of this situation being used against the employee unless the employee does not complete the EAP.  The employee may directly contact Lifeworks, a personal confidential counseling service. The telephone is 1-888-214-6668.

D. Confidentiality:  Employee Alcohol/Controlled Substance Testing Records are confidential. Test results and other confidential information may only be released to the employer, substance abuse professional and Medical Review Officer (as appropriate).

*Note:* This policy for AIRGAS employees subject to commercial driver's license standards as set forth by the FHWA modifies and supersedes in relevant part, the BOC previously published Alcohol and Drug Abuse Policy, 702, issued April, 1991.

AIRGAS

## EMPLOYEE/APPLICANT CONSENT FORM

I. I, _____, do
hereby give my consent to AIRGAS to collect a urine sample from
me on this date and further give my consent to AIRGAS to forward
the urine sample to LabCorp Laboratories for its performance of
appropriate tests thereon to identify the presence
of drugs. I furthermore give LabCorp Laboratories my
permission to release the results of such tests to AIRGAS.


_____          _____
        Date                    Signature-Employee/Applicant


_____          _____
        Date                    Signature-Company Witness

II. The urine sample I have provided today was placed in a container (s)
in my presence.


_____          _____
        Date                    Signature-Employee Applicant


_____          _____
        Date                    Signature-Medical Witness




PLEASE RETURN THIS FORM TO THE LOCAL AIRGAS HIRING MANAGER FOR RETENTION
IN THE PERSONNEL FILE.

AIRGAS WEST, INC.

EXHIBIT "F"

Safety Bonus Program

Effective November 1, 1991, safety bonus payments will be
distributed to all employees according to the following
program:

| MONTH | $ AMOUNT | TOTAL BY QUARTER | TOTAL BY YEAR |
|-------|----------|------------------|---------------|
| 1 | $20 | | |
| 2 | $20 | | |
| 3 | $20 | $60 | |
| 4 | $20 | | |
| 5 | $20 | | |
| 6 | $20 | $60 | |
| 7 | $30 | | |
| 8 | $30 | | |
| 9 | $30 | $90 | |
| 10 | $30 | | |
| 11 | $30 | | |
| 12 | $30 | $90 | $300 |
| 13 | $40 | | |
| 14 | $40 | | |
| 15 | $40 | $120 | |
| 16 | $40 | | |
| 17 | $40 | | |
| 18 | $40 | $120 | |
| 19 | $50 | | |
| 20 | $50 | | |
| 21 | $50 | $150 | |
| 22 | $50 | | |
| 23 | $50 | | |
| 24 | $50 | $150 | $540 |
| 24 + | $50 | $150 | $600 |

To be eligible for monthly safety bonus amount, employee must
complete the entire month without any avoidable accidents.
Should an accident occur or an employee fails to report an
accident by the end of the workday, the employee will forfeit
the month's bonus and revert back to the beginning of the
bonus rate schedule ($20.00) and continue on according to the
schedule. The payouts will be made on a quarterly basis.
Once an employee has reached the $50 level, the employee
will remain at that level for all future years unless an
accident should occur.  For the purposes of this safety
bonus distribution, an accident will be deemed avoidable by
the Safety Committee established by AIRGAS WEST, INC.'s Loss
Prevention Control Committee.

EXHIBIT "G"

Letter of Understanding
by and between
AIRGAS GASPRO and IBT Local 996

It is mutually understood and agreed by the above parties that pursuant to section 30.3 the Company and union will conduct a wage, classification, and job titles review as requested by the union.

The process of conducting this review is outlined below:

1.  A joint union management committee will be established.

2.  The committee will review wage classifications and job titles with the intent to provide an improved classification structure and promotional opportunities without jeopardizing the individual seniority rights of employees.

3.  This group will consist of the Operations Managers, the appropriate Department Manager, and two Assistant Business Agents selected by the union committee.

4.  This joint committee will meet during working hours once each month until October, 2007.

5.  Any recommendations made by this committee will not be implemented without mutual approval the West Division President of Airgas and the Union.  If approved, recommendations will be implemented in a mutually agreed to time frame.

6.  Any recommendations accepted or rejected under the terms of item #5 above are not subject to the grievance procedure.

7.  Upon execution of this document both parties agree that Section 30.3 of the labor contract will be eliminated from the contract.

This Letter of Understanding shall become effective immediately upon signature of Company and Union.

FOR THE EMPLOYER                           FOR THE UNION
AIRGAS GASPRO                              IBT Local 996

BY _____              BY _____

DATE ___11/04/06___                       DATE ___11/06/06___

55

EXHIBIT "H"

Letter of Understanding
by and between
AIRGAS GASPRO and IBT Local 996

In addition to the terms and conditions contained in the above referenced collective bargaining agreement between the Company and the Union, the Company and the Union further agree that:

The Company agrees to deduct from the paycheck of all associates covered by this agreement voluntary contributions to DRIVE. DRIVE shall notify the Company of the amounts designated by each contributing associate that are to be deducted from his/her paycheck. The Company will transmit to DRIVE National Headquarters on a monthly basis, in one check, the total amount deducted for said associates.

This Letter of Understanding shall become effective immediately upon signature of Company and Union.

FOR THE EMPLOYER                FOR THE UNION
AIRGAS GASPRO                   IBT Local 996

BY _____     BY _____
DATE  11/06/06                  DATE  10/06/06

56

EXHIBIT "I"

Letter of Understanding
by and between
AIRGAS GASPRO and IBT Local 996

It is mutually understood and agreed by the above parties that unit members listed below will be provided with a Retiree Medical Plan upon retirement as long as they provide a minimum of 90 days written notice to both the Company and the Union regarding their preferred retirement date and have reached age 55.

The eligible employees had at least 10 years of service by 11/1/06:
- Patrick Kaulia Jr.
- Ferdinand Micua
- William Yockman III
- Dwayne Walau
- Gary DeSa
- Gordon Oamilda
- Penisimani Latu
- Douglas McKee
- George Woolsey IV
- Daniel Manglallan
- Rico Lozano
- Emilio Baldonado
- Jason Coronel
- Sean Mercado
- Nicholas Rodrigues Jr.
- Glen Tabangcura
- James Johnston
- John Balmores
- Brian Carinio
- Michael Leite
- Herbert Paleka Jr.
- William Egdamin Jr.
- Vinson Gerona
- Kenneth Kolish

A summary of current terms are as follow:
- Percentage of company contribution to the cost of the plan is dependent upon years of service.
- 3% per year will be credited to employee, 2% towards spouse or dependents.
- Maximum company contribution is 90% for employees and 60% for spouse or dependents.
- Employee, spouse and dependents will be transferred to an available Medical Plan until age 65 or they become ineligible.
- Must elect to take Retiree Medical Plan no later than the effective date of retirement.
- At age 65, or when Medicare eligible, if earlier, the employee or spouse will be transferred to a Medicare supplemental plan. The total cost of the Medicare supplemental plan will be capped at $100 per month.

This Letter of Understanding shall become effective immediately upon signature of Company and Union.

FOR THE EMPLOYER                    FOR THE UNION
AIRGAS GASPRO                       IBT Local 996

BY _____ _____    BY _____

DATE ___11/06/06___                 DATE ___11/06/06___